STATE of Utah, Plaintiff and Respondent,

v.

Theodore Robert BUNDY, Defendant and Appellant.

Nos. 14741, 15534.

Supreme Court of Utah.

Dec. 28, 1978.

---

1. 26 Utah 2d 383, 490 P.2d 328 (1971).

2. 15 Utah 2d 72, 387 P.2d 246 (1963).

Bruce C. Lubeck, John D. O'Connell, Salt Lake City, for defendant and appellant.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., R. Paul VanDam, Salt Lake County Atty., Salt Lake City, for plaintiff and respondent.

ELLETT, Chief Justice:

The defendant was charged with, and convicted of, the crime of aggravated kidnapping. The trial was to the court sitting without a jury. An appeal was taken to this court; however, before the appeal was heard, counsel for the defendant claimed that he had newly discovered evidence which would warrant a new trial. This court, having confidence in the integrity of counsel, remanded the case on his motion to the district court where a hearing was had on the motion for a new trial and for extraordinary relief. The district court judge took evidence and heard arguments and finding the motion to be without merit denied it. An appeal was taken from that ruling to this court and the two appeals are now consolidated for our consideration.

The matter of granting or refusing to grant a new trial lies within the sound discretion of the trial judge and we will reverse his decision thereon only where he has abused that discretion.[1] In this case there was no abuse of discretion.

As to the facts of the case as revealed at the trial, the judge, as a trier of those facts, could readily have found beyond a reasonable doubt, and did so find, that an 18 year old girl was in a Shopping Mall where she was approached by a man who told her that someone had been trying to break into her automobile. She thought that he was a police officer. The area was well lighted and she stood face to face with him while they talked. The man asked her to accompany him to the car to see if anything was missing.

Upon reaching the car the girl looked in, determined nothing was missing, and so advised the man. He then told her that the alleged burglar was being held inside the mall, and once inside, the appellant told the girl that "they" must have taken the suspect down to the substation. He and the girl then walked straight across from where they had just entered the mall and walked around the building by a clothing store. Appellant asked her how old she was, if she was doing anything later that night, and why she would not be able to "go over there" and sign a complaint against the person who had allegedly tried to break into her car. This conversation occurred while the two were walking, with the girl slightly behind the man. The girl noticed the way he walked and that he was wearing green pants. Later at a lineup, she identified the appellant as her assailant immediately upon his entering the room because of, among other things, his manner of walking. She also observed that at the time of the offense he was wearing dark patent leather shoes, and that he was slim, weighing about 160 pounds, had greased back hair, and had a dark mustache which did not extend past the corners of his mouth.

She and the man walked to a nearby laundromat. The man tried to open the front door, found it to be locked, walked halfway down an alley between the laundromat and an adjoining building, turned around and came back. During this period of time, the girl again observed appellant's facial features as he was standing "right in front" of her in very good lighting conditions. She became suspicious of the situation and asked appellant if she could see his badge or some form of identification. He produced a wallet with a badge inside. She

1. *Kettner v. Snow,* 13 Utah 2d 382, 375 P.2d 28 (1962); *Haslam v. Paulsen,* 15 Utah 2d 185, 389 P.2d 736 (1964).

described the badge as "thinking it was silver, kind of oval shaped."

The man then asked her to accompany him to the police station and fill out a complaint since "they probably had him (the alleged burglar) down there." They walked to his car, described by her as a Volkswagen with a rip on the top of the backseat, rust spots on the front, no license plate, and of light color, either white or beige. The rip was described as going "almost all the way across" the top of the backseat.

They drove a couple of blocks to a school where appellant abruptly stopped, parking the car partially onto the curb. The girl nervously asked him what he was doing and why he was stopping because this was not a police station. The man grabbed her left arm and forcefully placed a pair of handcuffs on it. She grabbed the door on her side, managed to open it and get one foot out. The man grabbed her by the arm and around the neck. She kept screaming, "asking" him what he was doing. He then pulled out a gun, pointed it at her, and said he was "going to blow her head off." She managed to get out of the car but the man pursued her. They struggled outside the vehicle as she tried to free herself. She grabbed his arm and right hand and then felt an iron he was holding in his hand. She described it as having four or six sides, about one-half inch thick. Her impression was that the object was a crowbar since her father had one which she had felt before. To keep the assailant from striking her with the crowbar, she held it with her left hand.

She continued to scream "as loud as I could." She then testified that she turned away "pulling and *scratching*." Her fingernails, long at the time of the trial, were even longer the night of the incident and were broken in the scuffle. She recalled scratching the assailant during the fighting because she remembered noticing that all her fingernails were broken.

She finally succeeded in breaking away from her assailant. She ran into the street, the handcuffs still dangling from her arm. She managed to get a car to stop for her.

She jumped into the car, related briefly what had occurred, and requested them to take her to a police station. They drove her directly to the Murray Police Station.

At trial, the State and appellant's counsel stipulated that up to this point, the amount of time during which the girl had been with her assailant was between ten to fifteen minutes.

At the police station the victim was questioned by three police officers, one of whom removed the handcuffs which were both on the same wrist.

There is no contention made that no crime was committed. The defendant simply claims that he did not do it.

Two witnesses who lived in the same apartment with the defendant testified that he wore patent leather shoes on occasion.

There was human blood on the sleeve of the victim's coat which was type O. The defendant's blood type is O; that of the victim is type A.

Approximately nine months after the assault, at 2:30 a. m. on August 16, 1975, appellant was driving his Volkswagen in a residential area in Granger. Sgt. Robert Hayward of the Utah Highway Patrol, sitting in his patrol car, observed the Volkswagen pass him. Approximately five to eight minutes later, Sgt. Hayward started his car and while rounding a nearby corner, again observed the Volkswagen at the side of the street. As the patrol car approached, the appellant took off at a high rate of speed with his headlights off. Officer Hayward gave chase. Appellant subsequently ran a stop sign in an attempt to evade the officer. Finally appellant brought his Volkswagen to a stop.

Sgt. Hayward exited his car, approached the Volkswagen, and observed a "jimmy type pinch bar" (crowbar) behind the front seat on the back floor. He asked the appellant what he was doing in the area and then inquired, "Can I look in your car?" Appellant's response was, "go ahead." Sgt. Hayward stated that at no time did the appellant object to the search. The appellant was then placed under arrest for evading a police officer.

Moments later, Deputy Sheriff Twitchell and Sgt. Fife of the Salt Lake County Sheriff's Office arrived on the scene and were advised of the situation. Deputy Twitchell then asked the appellant "if he would mind if we looked through his vehicle." Appellant responded that "it was okay with him." Officer Twitchell further testified that to the best of his recollection, he did not remember appellant objecting to the search of his vehicle at any time. Appellant, a law student, denied giving his consent and testified that he passively stood by because he was intimidated.

A search of appellant's vehicle by Deputy Twitchell and Deputy Ondrak, who arrived subsequent to Deputy Twitchell and Sgt. Fife, produced a pair of handcuffs and the crowbar located on the floorboard behind the driver's seat. Deputy Ondrak testified that he remembered appellant's Volkswagen as being tan in color.

The victim had described the Volkswagen driven by her assailant as being a light color (white or biege); at one time she had said the car possibly could have been light blue but later eliminated that possibility. In connection with this, it should be noted that Mary Walsh, the first person to talk with the victim following her assault and kidnapping, testified that any confusion regarding the color of the Volkswagen driven by the assailant could be due to the type of lighting in the parking lot at the Mall which makes a car seem to be a different color than it really is. Also, a lady who lived downstairs from appellant in the same apartment building at the time of the kidnapping, testified that she had been in the appellant's car two or three times during the months of October and November of 1974, and that the color of appellant's Volkswagen was cream-color. James Dunn, a neighbor of appellant's, testified on his behalf, and although he admittedly may have been "kind of" color blind, he believed the appellant's Volkswagen to be "beige, light-colored."

After Sgt. Hayward was joined by the other deputies and officers at the scene, they asked the appellant what he was doing in that neighborhood. The appellant told the officers that he had attended a movie and then had gone for a drive. Appellant admitted at trial that this was a lie and further testified that he had also lied to one of his attorneys concerning the events of the evening of August 16, 1975.

When questioned at trial about the evening of August 16, 1975, appellant said the reason that he sped away from Sgt. Hayward was because he was "smoking dope" and did not want to be caught doing something illegal.

His final version of the events of that evening was that he was eating dinner and watching television until 12:00 midnight or 12:30 a. m., at which time he decided to visit a friend. Upon arriving at his friend's house, he noticed the lights were out. He decided not to awaken her and proceeded to drive around for a while, ending up in the Granger area where he decided to smoke some dope. He said he fled from the patrol officer in order to dispose of the marijuana and to open the car window in order to air out the interior of the automobile. The arresting officer testified that he saw nothing thrown from the fleeing car and that there was no smell of marijuana on the defendant or inside the car; and that he was well acquainted with the odor of marijuana. Two other officers at the scene of the arrest testified to the same effect as did the arresting officer.

At a pretrial hearing on a motion to suppress the evidence relating to the crowbar and handcuffs taken from the defendant's car, the trial judge found by a preponderance of the evidence that the defendant had consented to the search of his car and denied the motion to suppress. An acquaintance of the defendant testified that the defendant told her that he let the officers search his car when he was arrested.

The defendant, some five days after his arrest, gave the police permission to search his apartment. The search revealed several pairs of patent leather shoes. The officers also took several pictures of defendant's Volkswagen. The victim recognized the rips on the back seat as being like those she

had observed while being held captive in defendant's car. She testified at trial to the same effect. She further testified as to dents and rust spots on the Volkswagen as being the same as those observed at the time of the crime.

Other evidence given at trial clearly connected the defendant with the crime charged. It is not necessary to detail the incriminating evidence any further. The evidence already set out was sufficient to justify the judgment of the court.

■ Counsel for appellant complains because the court permitted the prosecution to discuss the probabilities of defendant's guilt by referring to various aspects of the evidence. The prosecutor's argument was proper for while any one circumstance might not convince the trier of the facts beyond a reasonable doubt, a great number of circumstances, taken together, could do so.

The claims of error have been carefully examined and we find no merit to any of them. The judgment is therefore affirmed.

It is to be noted that Mr. Bundy has fled from Utah and is now in the State of Florida where he is awaiting trial on charges of murder.

CROCKETT, WILKINS, and HALL, JJ., and F. HENRI HENRIOD, Retired J., concur.

MAUGHAN, J., having disqualified himself, does not participate herein.